# EXHIBIT "A"



# Electronically Certified Court Record

This is to certify that this is a true and correct copy of the original document, which may have redactions as required by law.

## DOCUMENT INFORMATION

| | |
|---|---|
| **Agency Name:** | Clerk of the Circuit Court & Comptroller, Palm Beach County |
| **Clerk of the Circuit Court:** | The Honorable Joseph Abruzzo |
| **Date Issued:** | 11/15/2023 9:36:59 AM |
| **Unique Reference Number:** | CAA-FBH-BCAJJ-CAIAFFBBC-HGJAHD-C |
| **Case Number:** | 502023CA014138XXXAMB |
| **Case Docket:** | PETITION |
| **Requesting Party Code:** | 517 |

## CERTIFICATION

Pursuant to Sections 90.955(1) and 90.902(1), Florida Statutes, and Federal Rules of Evidence 901(a), 901(b)(7), and 902(1), the attached document is electronically certified by The Honorable Joseph Abruzzo, Clerk of the Circuit Court & Comptroller, Palm Beach County, to be a true and correct copy of an official record or document authorized by law to be recorded or filed and actually recorded or filed in the office of the Clerk of the Circuit Court & Comptroller, Palm Beach County. The document may have redactions as required by law.

## HOW TO VERIFY THIS DOCUMENT

This electronically certified document contains a unique electronic reference number for identification printed on each page. This document is delivered in PDF format and contains a digital signature identifying the certifier and tamper-evident seal validating this document as a true and accurate copy of the original recorded. To view the tamper-evident seal and verify the certifier's digital signature, open this document with Adobe Reader software. Instructions for verifying this instrument are available [for customers in the USA and Canada](#) and [for customers in other countries.](#)

**The web address shown above contains an embedded link to the verification page for this particular document.



**** CASE NUMBER: 502023CA014138XXXAMB Div: AI ****
Filing # 182193133 E-Filed 09/28/2023 11:54:28 AM

IN THE CIRCUIT/COUNTY COURT OF THE FIFTEENTH JUDICIAL
CIRCUIT, IN AND FOR PALM BEACH COUNTY, FLORIDA

Case #

<u>DIANA JOHNSON</u>
Plaintiff

vs.

<u>PAUL FINKELMAN, PEACOCK TV LLC (DOS #5597150) c/o C T CORPORATION SYSTEM, ANNAPURNA PICTURES LLC  % The Corporation Trust Company, POINT GREY PICTURES LLC c/o DAVID LEVENTHAL, CAVIAR ENTERTAINMENT WORLDWIDE LLC % Lionel J Ball, Jason Woliner, Seth Rogen, Evan Goldberg, James Weaver, Loreli Alanis, Megan Ellison, Michael Sagol, Bert Hamelinck</u>
Defendants

PETITION FOR DEFAMATION, LIBEL AND SLANDER

This case arises out of the Peacock TV Network online streaming of the "Paul T. Goldman," Documentary Series directed by Jason Woliner which first episode aired on January 1, 2023 and last episode aired on January 22, 2023.

I.   FACTUAL BACKGROUND

In May 2022, Peacock had given a straight-to-series order to an untitled series, with Seth Rogen set to executive produce under his Point Grey Pictures banner. Director Jason Woliner had been working on the show, in some capacity, for more than a decade. Executive Producers were Jason Woliner, Seth Rogen and Evan Goldberg (who own the production company Point Grey Studios), James Weaver and Loreli Alanis (who are additional executive producers for Point Grey), Megan Ellison (for Annapurna), Michael Sagol and Bert Hamelinck (for Caviar). The Paul T. Goldman character was actually played by the defendant, Paul Finkelman himself (who also wrote all the scripts).

*The New Yorker* criticized the show's blasé portrayal of **Paul's misogyny and revenge porn**, stating that "**there's no reason to trust Woliner any more than his subject.**" *The Daily Beast* writes that the series **blurs fiction and reality** in a way that's nearly as bizarre as *The Rehearsal*."*Variety* called the series "**more cruel than dazzling.**"

FILED: PALM BEACH COUNTY, FL, JOSEPH ABRUZZO, CLERK, 09/28/2023 11:54:28 AM



Digitally signed by The Honorable Joseph Abruzzo
Date: 2023.11.15 09:37:30 -05:00
Clerk of the Circuit Court & Comptroller, Palm Beach Coun
Location: 205 N. Dixie Highway, West Palm Beach, FL 334

On *Rotten Tomatoes*, the critical consensus reads, "**This comedic docuseries-with-an-asterisk may strike some as ethically questionable** and others as too opaque to fuss over, but there's no denying that *Paul T. Goldman* makes an unforgettable impression."

The Paul T. Goldman Documentary series streamed on Peacock TV Network and focused on Paul T. Goldman's (a.k.a Paul Finkelman) world is turned upside down when he finds out that his wife, Audrey Munson (a.k.a. Diana Johnson), has been **living a secret double life as a prostitute, dating her pimp Royce Rocco and running an international sex trafficking ring.**

Paul Finkelman claims Paul T. Goldman is an American **true crime documentary** and is based on his semi-autobiographical self-published book, self-published books, self-published screenplay, self-published spinoff series and his **published book called "Duplicity: A True Story of Crime and Deceit" - Prostitution**, published by CreateSpace Independent Publishing Platform,  ISBN 143924345X, 9781439243459: Originally published August 21, 2009 - 326 pages.


The plaintiff' complaint seeks compensatory, punitive damages and possible criminal charges.

To establish a claim of defamation, the plaintiff must prove the following:

(1) a false and defamatory statement was made concerning the plaintiff; (2) there was an unprivileged publication to a third party; (3) the publisher was negligent in publishing the defamatory statement; (4) the plaintiff suffered damages resulting from publication of the defamatory statement.

Mitchell v. Random House, Inc., 703 F. Supp. 1250, 1255 (S.D. Miss. 1988), aff'd, 865 F.2d 664 (5th Cir. 1989). "To be actionable as defamation, the statements made must be false and must be clearly directed toward and be 'of and concerning [the] plaintiff.'" Id., citing Ferguson v. Watkins, 448 So. 2d 271, 275 (Miss. 1984). "Moreover, to state a claim for defamation, it is necessary that the defamation be 'clear and unmistakable from the words themselves and not the product of innuendo, speculation or conjecture.'" Id. at 1256, quoting Ferguson, 448 So.2d at 275. Both the Fifth Circuit and the Supreme Court have emphasized that these requirements must be "strictly enforced." Mize v. Harvey Shapiro Enterprises, Inc., 714 F.Supp. 220, 224 (N.D. Miss. 1989) ("The Fifth Circuit has recognized that [the 'of and concerning'] requirements are stringently applied by courts and indicated that it will do the same.") (citing Mitchell, 865 F.2d at 669);Ferguson, 448 So.2d at 275. Under the law, "the trial court in a defamation case must make the threshold determination of whether the language in question is actionable." Mitchell, 703 F.Supp. at 1256; see also Chatman v. Gulf Publ'g Co., 502 So.2d 647, 650 (Miss. 1987) (court must determine, in first instance, whether statement at issue was "clearly directed" at plaintiff).

Unique Code : CAA-FBH-BCAJJ-CAIAFFBBC-HGJAHD-C  Page 2 of 15

Unique Code : CAA-FBH-BCAJJ-CAIAFFBBC-HGJAHD-C Page 3 of 15

"In order to state a libel claim, plaintiffs must allege facts showing that the alleged defamatory statement was published 'of or concerning' them. . . . Whether the complaint alleges facts sufficient to demonstrate a reasonable connection between the plaintiff and the alleged libel is a question for the court."; Excellus Health Plan, Inc. v. Tran, 287 F.Supp.2d 167, 174 (W.D.N.Y. 2003)

In the last Episode, Paul claims that he wants to make amends for all the pain, suffering and damages that he caused.

There are consequences of accusing potentially innocent people of criminal acts.

The plaintiff can identify herself as the target of an alleged defamation since the allegedly defamatory statement points to her. It is not necessary that the plaintiff be mentioned by name; however, it must appear on the face of the complaint that a third person viewing the series would reasonably have understood that the allegedly defamatory content was of and concerning the plaintiff and that it referred to them.  Coffey v. MacKay, 277 N.E.2d 748, 752 (Ill.App. 1972).

The Restatement (Second) of the Law of Torts provides that "[a] defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer." Restatement (Second) of Torts, § 564. Comment b further states: It is not necessary that the plaintiff be designated by name; it is enough that there is such a description of or reference to him or her that those who hear or read reasonably understand the plaintiff to be the person intended. Extrinsic facts may make it clear that a statement refers to a particular individual although the language used appears to defame nobody. . . . It is not necessary that everyone recognizes the other as the person intended; it is enough that any recipient of the communication reasonably so understands it. However, the fact that only one person believes that the plaintiff was referred to is an important factor in determining the reasonableness of his or her belief. If the applicability of the defamatory matter to the plaintiff depends upon extrinsic circumstances, it must appear that some person who saw or read it was familiar with the circumstances and reasonably believed that it referred to the plaintiff. Restatement (Second) of Torts, § 564, comment b.

The plaintiff argues that the defendants "targeted the plaintiff."

The documentary was published without Diana's permission, she didn't even know it was being published nor was anything sent to her for her review.  The documentary was designed to make Diana look bad because they don't reveal until the very end that they think Paul is lying. Diana will quantify the damages as much as possible. She will put a number on her damaged reputation including but not limited to limited to her reputation in the community, the destruction of a few marriages, damages to her family and damages to several other relationships, costs of custody

Unique Code : CAA-FBH-BCAJJ-CAIAFFBBC-HGJAHD-C   Page 4 of 15

disputes, cost of jobs loss and salary loss ($60,000 per year as a teacher), costs of pain and suffering due to Paul's indirect cause of her parents deaths, severe mental, emotional distress and pain.

A court must look only at the pleadings, accept the well-pleaded allegations contained in them as true, and view them in a light most favorable to the plaintiff. Jones v. Geninger, 188 F.3d 322, 324 (5th Cir. 1999); Fee v. Herndon, 900 F.2d 804, 807 (5th Cir. 1990). The court may also take into account any judicially noticed facts. Herbert Abstract v. Touchstone Properties, Ltd., 914 F.2d 74, 76 (5th Cir. 1990). Ordinarily, if matters outside the pleadings are also presented to the court for consideration, a Rule 12(c) motion must be treated as one for summary judgment. See Fed.R.Civ.P. 12(c); Darlak v. Bobear, 814 F.2d 1055, 1064 (5th Cir. 1987). However, there is an exception to the general rule that a court is precluded from considering material outside the complaint on a Rule 12(c) motion. If a document is referred to in the complaint, is "central" to the dispute, and no party questions its authenticity, then it may be considered by the court. International Audiotext Network, Inc. v. ATT Co., 62 F.3d 69, 72 (2nd Cir. 1995); Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994); Venture Associates Corp. v. Zenith Data Systems Corp., 987 F.2d 429, 431 (7th Cir. 1993). See also Salts v. Moore, 107 F.Supp.2d 731, 735 (N.D. Miss. 2000) (on Rule 12(c) motion, court may consider documents incorporated by reference in the pleadings). In this case, the online streaming and written transcript of the "Paul T. Goldman" Documentary series are clearly referred to in the complaint, are central to the dispute, and their authenticity is not questioned.

"The real test in weighing identification is whether some nexus exists between the plaintiff and the allegedly defamatory language." Klauder, 66 Pa. D.C.2d at 275. In the instant case, a clear connection can be shown between the plaintiff and the allegedly defamatory statements. Therefore, the Court must conclude as a matter of law that a viewer of the program could have reasonably believed these statements were intended to refer to the plaintiff.

II.     ISSUES
1. Is there sufficient evidence to support a finding that the plaintiff was defamed?
2. Are defamatory communications posted on the Internet libel or slander?
3. Was a finding of actual malice within the meaning of New York Times Co. v. United States (1971) 403 U.S. 713 (New York Times) required to hold defendants liable for defamation?
4. Is an injunction required?

Summary of Issues:  1) A cause of action for defamation toward a private individual requires five elements: (1) publication; (2) falsity; (3) that the alleged tortfeasor act at least negligently on a matter concerning the private individual; (4) actual damages; and (5) a defamatory statement.

III.    DISCUSSION

Unique Code : CAA-FBH-BCAJJ-CAIAFFBBC-HGJAHD-C Page 5 of 15

A.   Is There Sufficient Evidence to Support a Finding That Plaintiff Was Defamed?

Defendants contend that there is sufficient evidence to support the court's determination that defendants defamed the plaintiff "by a statement or statements" that were libelous on their face. (Bose Corp. v. Consumers Union of U.S., Inc. (1984) 466 U.S. 485, 499 quoting New York Times Co. v. Sullivan (1964) 376 U.S. 254, 284-286; and see Franklin v. Leland Stanford Junior University (1985) 172 Cal.App.3d 322, 330.)

We begin with a brief overview of that which constitutes defamation. Defamation is an invasion of the interest in reputation. (Smith v. Maldonado (1999) 72 Cal.App.4th 637, 645.) Libel, one of the two forms of defamation, is defined as a false and unprivileged publication "which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.)

Publication of a defamatory statement requires communication of the statement to some third person who understands both the defamatory meaning of the statement and its application to the person to whom reference is made. (Ringler Associates Inc. v. Maryland Casualty Co. (2000) 80 Cal.App.4th 1165, 1179.) In deciding whether a statement is defamatory, one must consider that which is explicitly stated as well as that which is insinuated or implied. (Forsher v. Bugliosi (1980) 26 Cal.3d 792, 803.) The result is driven by the " 'totality of circumstances' " in the case at hand, beginning with the language of the statement itself and then considering the context in which the statement was made. (Baker v. Los Angeles Herald Examiner (1986) 42 Cal.3d 254, 260-261.)

It is an essential element of defamation that the publication consists of a false statement of fact rather than opinion. (Gertz v. Robert Welch, Inc. (1974) 418 U.S. 323, 339-340 (Gertz).) But a statement of opinion may be actionable " 'if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.' " (Okun v. Superior Court (1981) 29 Cal.3d 442, 451-452.) "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." (Milkovich v. Lorain Journal Co. (1990) 497 U.S. 1, 18-19.)

On the other hand, "where potentially defamatory statements are published in a public debate, a heated labor dispute, or in another setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion." (Gregory v. McDonnell Douglas Corp. (1976) 17 Cal.3d 596, 601.) The dispositive question is whether a reasonable factfinder could conclude that the published statements imply an assertion of defamatory fact. (Milkovich v. Lorain Journal Co., supra, 497 U.S. at p. 21.)

Defendants may argue generally that Peacock TV Network "Paul T. Goldman," Documentary Series are so filled with outrageous episodes that any reasonable person would take a typical outrageous episode as a true statement of fact. We do not accept the argument for a number of reasons. First, we assume that one reason people viewed these episodes was due to the fact that it was a so-called Documentary. (Lidsky, "Silencing John Doe: Defamation & Discourse in Cyberspace," 49 Duke Law Journal 855, 886 (2000) (Lidsky).) The Internet may be the "new marketplace of ideas," (id. at pp.

Unique Code : CAA-FBH-BCAJJ-CAIAFFBBC-HGJAHD-C Page 6 of 15

893-894). Some curb on abusive speech is necessary for meaningful discussion. Second, the mere fact that the audience might not have believed defendants' documentary does not change their defamatory character. In order that the defendant's words are defamatory, they are understood in a defamatory sense. It is not necessary that anyone believe them to be true, since the fact that such words are in circulation at all concerning the plaintiff was injurious to her reputation and other damages. (Arno v. Stewart (1966) 245 Cal.App.2d 955, 962-963 quoting Prosser, The Law of Torts (3d ed. 1964) § 106, pp. 763-764.) Finally, the defendants' documentary was typical outrageous streaming. Defendants' documentary was especially vituperative personal attacks.

Defendants may further argue that certain categories of statements such as those alleging sexual impropriety, incompetence, or lying are defamatory because they are similar to statements in other cases that found such statements to be defamatory. These comparisons are helpful. The unique circumstances of each case must be considered when evaluating a statement for its defamatory content.

We first focus on defining statements that would be libelous on their face, or libel per se. The reason we do so involves the issue of damages. A libel that is defamatory "without the necessity of explanatory matter" is a libel per se. (Civ. Code, § 45a.) Only a libel per se is actionable without proof of special damages. (Ibid.)

The court determines as a matter of law that a statement that asserted or implied as a fact any one of different facts, would, if untrue, be libel per se.  (See Smith v. Maldonado, supra, 72 Cal.App.4th at p. 647.) By means of a special verdict form the court may be asked to determine whether defendants had defamed plaintiffs "by a statement or statements which were libelous on their face." The court may be asked to identify any specific statement as defamatory. Thus, by answering "yes" to the question of whether defendants had defamed plaintiffs by "a statement or statements which were libelous on their face," the court may necessarily find that defendants had made untrue statements expressing or implying as a fact one or more of the facts the court listed. Because defendants did assert here that these statements were true, we focus our review solely on the question of whether there were statements that asserted or implied any such facts as to the plaintiff. We have no trouble identifying many that do. There are numerous episodes that either directly assert or imply that the plaintiff was professionally acting in illegal sexual behaviors, that she engaged in sex outside of marriage, that she was a liar, and that she held her position by having sex for money. The "dress with a stain" message is typical. Any recipient of that message in 1998 or 1999 would have reasonably concluded that the "dress with the stain" remark was intended to refer to the Clinton/Lewinsky affair in which the White House intern was supposed to have preserved a dress stained with the President's semen. (See Schmidt, FBI To Test Lewinsky Dress, Wash. Post (Jul. 31, 1998) p. A4.)

The record is full of similar statements, some more direct about that which defendants were asserting, There are numerous statements about the plaintiff stating or implying defamatory facts. A reasonable factfinder could conclude that these statements assert or imply as a fact that the plaintiff's judgment was regularly impaired. This is defamation.

In sum, there is sufficient evidence to support the court's finding that defendants had defamed the plaintiff.

Unique Code : CAA-FBH-BCAJJ-CAIAFFBBC-HGJAHD-C Page 7 of 15

And finally, there is an ample evidentiary basis to support the petition. We will identify a great number of statements that could have been construed as libelous within the limits the court set.

B.  Are defamatory communications posted on the Internet libel or slander?
Plaintiff next argues that to the extent their Internet Documentary could be considered defamatory, she must be characterized as slander. Plaintiff points out that the distinction is crucial because slander requires proof of special damages and libel does not and since plaintiffs will prove special damages, she can recover for defamation.

Moreover, the distinction between libel and slander involves a practical difference in the requirements for pleading and proof so that the question is one that is likely to recur. A defamatory communication may be characterized either as libel or slander. (Civ. Code, § 44.) The traditional distinction between libel and slander is that libel is written and slander is spoken. Slander was considered a sin in Medieval England. (Dobbs, The Law of Torts, (2001) Ch. 28, § 400, p. 1117 (Dobbs).) When the action migrated to the civil courts the courts required proof of "temporal" or actual damages to avoid interfering with the church's authority over spiritual matters. (Prosser & Keeton, Torts (5th ed. 1984) ch. 19 Defamation § 112, p. 788 (Prosser).)

Libel arose with the advent of the printing press. Libel was at first a crime and was used to suppress political writings. It was later applied to non-political defamatory writings. Libel has been considered the greater wrong, either because of its criminal origins (Prosser, Torts, supra, § 112 at p. 785) or because the permanence of its form endowed it with a greater propensity to breach the peace. (Dobbs, supra, § 400 at p. 1117; Ostrowe v. Lee (1931) 256 N.Y. 36, 39.) In any event, by the early 19th Century libel was actionable per se, that is, damage was presumed. (Prosser, supra, at p. 786.)

Libel today is defined as a defamatory publication communicated "by writing, printing, picture, effigy, or other fixed representation to the eye . . . ." (Civ. Code, § 45, italics added.) Slander is "orally uttered, and also communications by radio or any mechanical or other means . . . ." (Civ. Code, § 46, italics added (hereafter section 46).) Television broadcasts are also treated as slander in this state. (See White v. Valenta (1965) 234 Cal.App.2d 243, 254.)

Plaintiff argues that Internet Documentary falls into the statutory classification of slander because they are communications by "any mechanical or other means" as specified in the slander statute. (§ 46.) Logic tells us that "mechanical or other means" applies to all mechanical methods for producing a communication. After all, the cause of action for libel arose with the invention of mechanical means for reproducing the printed word. But the slander statute itself contains no clue to what the Legislature intended by the phrase. Accordingly, we may resort to legislative history. (ITT World Communications, Inc. v. City and County of San Francisco (1985) 37 Cal.3d 859, 868.)

Prior to 1945 Civil Code section 46 defined slander as a "false and unprivileged publication other than libel." (Stats. 1945, ch. 1489, § 2.) At the time there was some dispute about whether radio broadcasts should be characterized as slander or libel since even though communications delivered by radio were spoken, in most cases the messages were read from a written script. (Prosser, supra, § 112 at p. 787.)

Some jurisdictions reasoned that because radio broadcasts had such a great potential for injury they should be treated as the supposedly greater wrong of libel. (Ibid.) By categorizing radio broadcasts as slander, our Legislature adhered to the traditional distinction between libel and slander, i.e., that libel is written and slander is spoken.

The legislative history of the 1945 amendments contains one illuminating reference to the phrase "mechanical or other means."  In a letter urging the governor to sign the bill the bill's supporters explained:  "Radio broadcasters are definitely placed under the slander provisions of the code in Section 46, the present law defining slander, by addition of the words, 'orally uttered, and also communications by radio or any mechanical or other means which. . . .'  This wording includes radio broadcasts directly spoken, those which are mechanically reproduced by transcriptions and we believe will include broadcasts from sound trucks."  (Newspaper Publishers Association and Hearst Publications letter to Governor Warren, Jun. 22, 1945, p. 1.)  (Stats. 1945, ch. 1489.)  "Transcription" as used here is defined as "a tape, disc, or other recording made for broadcast or rebroadcast of a radio or television program."  (Webster's 3d New Internat. Dict. (1993) at p. 2426.)  This reference in the legislative history supports our conviction that the Legislature intended to maintain the traditional distinction between libel and slander and that "mechanical or other means" must have been intended to encompass only means of auditory communication. .

Defendants' documentaries were publications.  The episodes were composed and transmitted in the form of spoken words and actions.  They are representations "to the eye."  The spoken words are certainly "fixed."  Furthermore, the statements are just as easily preserved (as by printing them).  In short, the only difference between the publications defendants made in this case and traditionally libelous publications is defendants' choice to disseminate them electronically.

It has been noted that many forms of publication available to us today "cannot realistically be analyzed by reference to the traditional libel-slander dichotomy, which modern technology has rendered increasingly obsolete. [Citations.]"  (Polygram Records, Inc. v. Superior Court (1985) 170 Cal.App.3d 543, 552, fn. 9.)  In this case, however, the publications are readily analyzed by reference to the existing statutes.  We hold that written defamatory communications published by means of the Internet are properly characterized as libel.

C.   Are the Defendants Liable for Defamation on Proof of Mere Negligence?
A plaintiff who is not a public figure may recover damages for defamation without clear and convincing proof that the defamatory statement was made with actual malice. (New York Times Co. v. Sullivan, supra, 376 U.S. at pp. 279-280.)  Actual malice in this context means that the defendant published the defamatory documentary "with knowledge that it was false or with reckless disregard of whether it was false or not." (Id. at p. 280.)  If plaintiffs are not public figures, then liability may be established on proof of mere negligence. (Brown v. Kelly Broadcasting Co. (1989) 48 Cal.3d 711, 747.)  If the defamation involves an issue of public concern, proof of actual malice is necessary to recover presumed or punitive damages even if the plaintiff is not a public figure. (Gertz, supra, 418 U.S. at pp. 347, 349; Dun & Bradstreet, Inc. v. Greenmoss Builders (1985) 472 U.S. 749, 756 (Dun & Bradstreet).)

Unique Code : CAA-FBH-BCAJJ-CAIAFFBBC-HGJAHD-C Page 9 of 15

There are two types of public figures: all-purpose public figures and limited-purpose public figures. All-purpose public figures are those persons who "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes." (Gertz, supra, 418 U.S. at p. 345.) In order for a plaintiff to be deemed an all-purpose public figure, there must be "clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society . . . ." (Id. at p. 352.)

Limited-purpose public figures are those who have "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." (Gertz, supra, 418 U.S. at p. 345.) This type of public figure "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." (Id. at p. 351.) There are three aspects to the analysis.

Paintiffs' decision to sue can hardly be characterized as voluntary since she had no recourse but to file the lawsuit if she wanted the offending publications to cease.
.
D.      Is the Injunction Required?
The trial judge should find that defendants' had streamed very serious defamations and that they are likely to continue to do so since they promised to continue streaming new episodes. Plaintiff requests an injunction restraint on speech. Plaintiff requests an injunction that prevents defendants "from speaking on the Internet or anywhere else on a broad range of topics," to prohibit "future speech," and prevents them from posting untruthful information.

The balance of the injunction should prohibit defendants from using the names of the individual plaintiff as aliases or screen names; require defendants to take all steps necessary to have any existing episodes that the trial court finds to be defamatory removed from the Internet; includes very broad stay-away order; and incorporate various orders designed to aid plaintiffs in tracking defendants' online activities.

Prohibit "any written statements that are untrue, expressly or by implication, with regard to any person identified, which the Court finds are untrue, a general prohibition on defamatory statements.

A prior restraint is an administrative or judicial order that forbids certain speech in advance of the time the communication is to occur. (Alexander v. United States (1993) 509 U.S. 544, 550; see also DVD Copy Control Assn., Inc. v. Bunner (2003) 31 Cal.4th 864, 886.) "Temporary restraining orders and permanent injunctions-i.e., court orders that actually forbid speech activities-are classic examples of prior restraints." (Alexander v. United States, supra, 509 U.S. at p. 550.)

"The presumption against prior restraints is heavier-and the degree of protection broader-than that against limits on expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech after they break the law rather than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable." (Southeastern Promotions, Ltd. v. Conrad (1975)

420 U.S. 546, 558-559.)  The government bears a heavy burden to justify a prior restraint. (New York Times, supra, 403 U.S. at p. 714; Organization for a Better Austin v. Keefe (1971) 402 U.S. 415, 419.) United States Supreme Court decisions that have upheld injunctions based upon past unlawful conduct have done so not only because the past conduct was unlawful, but also because the restrictions did not involve censorship of speech but were merely limits on the time, place and manner.  (See DVD Copy Control Assn., Inc. v. Bunner, supra, 31 Cal.4th at p. 893 (conc. opn. of Moreno, J.).)  A content-based regulation (as opposed to an injunction) is permissible if it is necessary to serve a compelling state interest and is narrowly drawn to achieve that end.  (See Perry Ed. Assn. v. Perry Local Educators' Assn. (1983) 460 U.S. 37, 45.)  The United States Supreme Court has not articulated a test for analyzing a content-based injunction, but such a rule would undoubtedly be stricter than the Madsen rule.

One of the reasons for the law's reluctance to enjoin defamation is the difficulty of determining in advance whether or not a particular publication will be defamatory.  It has only been in cases where that determination may be made with some reliability that injunctions prohibiting defamation have been upheld.  For example, Advance Training prohibited certain books; Retail Credit prohibited the "exact allegations" the credit reporting agency had previously published.  In both cases there was a judicial determination not only that the statement was untrue, but also that the context rendered it defamatory.  Such injunctions do not suffer from the problem at hand.

Defendants also may contend that the injunction impermissibly grants relief to persons who were not joined as parties to the lawsuit.  Plaintiffs contend that the injunction necessarily must apply to third parties in order to afford complete relief.

IV.     Conclusion

The 2023 Florida Statutes, CHAPTER 836, DEFAMATION; LIBEL; THREATENING LETTERS AND SIMILAR OFFENSES

  836.01   Punishment for libel.—Any person convicted of the publication of a libel shall be guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.

  History.—s. 15, sub-ch. 7, ch. 1637, 1868; RS 2418; GS 3256; RGS 5087; CGL 7189; s. 987, ch. 71-136.

  836.02   Must give name of the party written about.—

  (1)   No person shall print, write, publish, circulate or distribute within this state any newspaper, magazine, periodical, pamphlet, or other publication of any character, either written or printed, wherein the alleged immoral acts of any person are stated or pretended to be stated, or wherein it is intimated that any person has been guilty of any immorality, unless such written or printed publication shall in such article publish in full the true name of the person intended to be charged with the commission of such acts of immorality.

Unique Code : CAA-FBH-BCAJJ-CAIAFFBBC-HGJAHD-C Page 11 of 15

(2)   Any person convicted of any violation of this section shall be guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083. Any person who shall aid in any way in the writing or printing of any literature in violation of this section shall be punished in the same manner as the principal might be punished upon conviction; provided, nothing in this section shall apply to mechanical employees in printing offices, or to newsboys.

**History.**—ss. 1, 2, 3, ch. 4733, 1899; GS 3257; RGS 5088; CGL 7190; s. 988, ch. 71-136.

**836.03   Owner or editor of the paper also guilty.**—Any owner, manager, publisher or editor of any newspaper or other publication who permits any anonymous communication or communications such as is signed otherwise than with the true name of the writer, and such name published therewith to appear in the columns of the publication in which said communication any person is attacked in his or her good name, or it is attempted to bring disgrace or ridicule upon any person, such owner, manager, publisher or editor shall be guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.

**History.**—s. 4, ch. 4733, 1899; GS 3258; RGS 5089; CGL 7191; s. 989, ch. 71-136; s. 1306, ch. 97-102.

**836.04   Defamation.**—Whoever speaks of and concerning any woman, married or unmarried, falsely and maliciously imputing to her a want of chastity, shall be guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.

**History.**—s. 1, ch. 3460, 1883; RS 2419; GS 3260; RGS 5091; CGL 7193; s. 990, ch. 71-136.

**836.05   Threats; extortion.**—

(1)   Whoever, either verbally or by a written or printed communication, maliciously threatens to accuse another of any crime or offense, or by such communication maliciously threatens an injury to the person, property or reputation of another, or maliciously threatens to expose another to disgrace, or to expose any secret affecting another, or to impute any deformity or lack of chastity to another, with intent thereby to extort money or any pecuniary advantage whatsoever, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will, commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(2)   A person who commits a violation of subsection (1) and at the time of the violation is acting as a foreign agent, as defined in s. 812.081(1), with the intent of benefiting a foreign country of concern, as defined in s. 692.201, commits a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

**History.**—s. 42, sub-ch. 3, ch. 1637, 1868; RS 2420; GS 3261; RGS 5092; CGL 7194; s. 1, ch. 57-254; s. 991, ch. 71-136; s. 1307, ch. 97-102; s. 11, ch. 2023-33.

**836.08   Correction, apology, or retraction by newspaper.**—

(1)   If it appears upon the trial that said article was published in good faith; that its falsity was due to an honest mistake of the facts; that there were reasonable grounds for believing that the statements in said article were true; and that, within the period of time specified in subsection (2), a full and fair correction, apology, and retraction was published in the same editions or corresponding issues of the newspaper or periodical in which said article appeared, and in as conspicuous place and type as was said original article, then any criminal proceeding charging libel based on an article so retracted shall be discontinued and barred.

(2)   Full and fair correction, apology, or retraction shall be made:

(a)   In the case of a broadcast or a daily or weekly newspaper or periodical, within 10 days after service of notice;

(b)   In the case of a newspaper or periodical published semimonthly, within 20 days after service of notice;

(c)   In the case of a newspaper or periodical published monthly, within 45 days after service of notice; and

(d)   In the case of a newspaper or periodical published less frequently than monthly, in the next issue, provided that notice is served no later than 45 days prior to such publication.

**History.**—s. 2, ch. 16070, 1933; CGL 1940 Supp. 7064(2); s. 993, ch. 71-136; s. 2, ch. 80-34.

**836.11   Publications which tend to expose persons to hatred, contempt, or ridicule prohibited.**—

(1) It shall be unlawful to print, publish, distribute or cause to be printed, published or distributed by any means, or in any manner whatsoever, any publication, handbill, dodger, circular, booklet, pamphlet, leaflet, card, sticker, periodical, literature, paper or other printed material which tends to expose any individual or any religious group to hatred, contempt, ridicule or obloquy unless the following is clearly printed or written thereon:

(a) The true name and post office address of the person, firm, partnership, corporation or organization causing the same to be printed, published or distributed; and,

(b) If such name is that of a firm, corporation or organization, the name and post office address of the individual acting in its behalf in causing such printing, publication or distribution.

(2) Any person, firm or corporation violating any of the sections of this statute shall be guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.

**History.**—ss. 1, 2, ch. 22744, 1945; s. 996, ch. 71-136.

**836.115   Cyberintimidation by publication.**—

(1) As used in this section, the term:

(a) "Electronically publish" means to disseminate, post, or otherwise disclose information to an Internet site or forum.

(b) "Harass" has the same meaning as provided in s. 817.568(1)(c).

(c) "Personal identification information" has the same meaning as provided in s. 817.568(1)(f).

(2) It is unlawful for a person to electronically publish another person's personal identification information with the intent to, or with the intent that a third party will use the information to:

(a) Incite violence or commit a crime against the person; or

(b) Threaten or harass the person, placing such person in reasonable fear of bodily harm.

Unique Code : CAA-FBH-BCAJU-CAIAFFBBC-HGJAHD-C Page 13 of 15

Unique Code : CAA-FBH-BCAJU-CAIAFFBBC-HGJAHD-C Page 14 of 15

A person who violates this subsection commits a misdemeanor of a first degree, punishable as provided in s. 775.082 or s. 775.083.

**History.**—s. 14, ch. 2021-6.

Defamation per se, is a tort recognized under Florida law when brought against a non-media defendant. Blake v. Giustibelli, 182 So. 3d 881, 884–85 (Fla. Dist. Ct. App. 2016) ("[A]fter Gertz, in libel cases involving media defendants, fault and proof of damages must always be established. . . . Libel per se otherwise still exists in Florida.").1 "Under 1 Horowitch v. Diamond Aircraft Indus., Inc., 645 F.3d 1254, 1257 (11th Cir. 2011), certified question answered, 107 So. 3d 362 (Fla. 2013) ("As a federal court sitting in diversity jurisdiction, we apply the substantive law of the forum state, in this case Florida, alongside federal procedural law."). Case 9:20-cv-80527-KAM Document 16 Entered on FLSD Docket 07/24/2020 Page 4 of 14 5 Florida law, to state a claim for defamation—libel or slander—the plaintiff must allege that: '(1) the defendant published a false statement; (2) about the plaintiff; (3) to a third party; and (4) that the falsity of the statement caused injury to the plaintiff.'" Matonis v. Care Holdings Grp., L.L.C., 423 F. Supp. 3d 1304, 1315 (S.D. Fla. 2019) (quoting Alan v. Wells Fargo Bank, N.A., 604 Fed. App'x. 863, 865 (11th Cir. 2015)). "A written publication constitutes libel per se under Florida law if, when considered alone and without innuendo, it (1) charges that a person has committed an infamous crime; (2) tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (3) tends to injure one in his trade or profession." Alan v. Wells Fargo Bank, N.A., 604 F. App'x 863, 865 (11th Cir. 2015). "The significance of the classification of a communication as actionable per se lies in the fact that its victim need not plead or prove malice (except where a privilege is involved) or special damage because malice and the occureence [sic] of damage are both presumed from the nature of the defamation." Wolfson v. Kirk, 273 So. 2d 774, 777 (Fla. Dist. Ct. App. 1973)

At the time that Defendants online streamed the Paul T. Goldman Documentary series, the Defendants knew that its statements were false and entertained serious doubts concerning its truthfulness.

Defamatory statements were made and published. These statements were false and made with 'actual malice,' that was with knowledge that they were false and were made with reckless disregard of whether or not it was false.

As a result of Defendant's conduct, the Plaintiff has suffered damage including but not limited to her reputation in the community, the destruction of a few marriages, damages to her family and damages to several other relationships, costs of custody disputes, cost of jobs loss and salary loss ($60,000 per year as a teacher), costs of pain and suffering due to Paul's indirect cause of her parents deaths, severe mental, emotional distress and pain.

Unique Code : CAA-FBH-BCAJJ-CAIAFFBBC-HGJAHD-C Page 15 of 15

Because the plaintiff's complaint does provide sufficient evidence to establish that the defamatory, libel and slander statements were "of and concerning" or "clearly directed toward" the plaintiff, motion for judgment on the pleadings should be granted for the plaintiff.

Accordingly, Plaintiff demands Judgment against Defendants for actual and punitive damages in excess of One-Hundred Fifty Million Dollars ($150,000,000), interest, and costs and to consider possible criminal charges.

Diana Johnson
(321) 213-8583
09/28/2023

Copies Furnished:
PAUL FINKELMAN, PEACOCK TV LLC (DOS #5597150) c/o C T CORPORATION SYSTEM, ANNAPURNA PICTURES LLC  % The Corporation Trust Company, POINT GREY PICTURES LLC c/o DAVID LEVENTHAL, CAVIAR ENTERTAINMENT WORLDWIDE LLC % Lionel J Ball, Jason Woliner, Seth Rogen, Evan Goldberg, James Weaver, Loreli Alanis, Megan Ellison, Michael Sagol, Bert Hamelinck